# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**VERSUS**

**LEON WILLIAMS**

**CRIMINAL ACTION**

**NO. 18-143-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on *Defendant's Motion to Suppress* (Doc. 19) filed by Leon Williams ("Defendant" or "Williams"). The Government opposes the motion. (Doc. 21.) Defendant filed a reply. (Doc. 22.) Following the May 21, 2019, evidentiary hearing (Doc. 30), both parties submitted post-hearing briefs (Docs. 35, 36), and the Government filed a post-hearing reply (Doc. 37). Further argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is denied.

## I. Relevant Background

The basic facts are undisputed. On February 27, 2018, at around 4:15 p.m., Corporal Brian Jones and Sergeant Kyle Callihan of the Baton Rouge Police Department were stationed by a parking lot across from the federal courthouse, near the intersection of Florida Street and North Ninth Street. Defendant was a passenger in a silver 2003 Mercedes C230 sedan that was traveling down North Ninth Street toward Florida Street—though how they got to North Ninth Street is a contentious fact at issue.

The parties agree that Corporal Jones effectuated the stop and had the Mercedes pull into the parking lot. After the stop, Jones smelled marijuana. After prompting, the driver, Jerry Thomas, produced a small bag of marijuana and said that he and the Defendant had rolled a blunt.

When asked about the blunt, Defendant said he ate it. Eventually, Callihan searched under the passenger seat, where Defendant had previously been sitting. Callihan found a pistol and more marijuana.

The parties also agree that, during the encounter, Callihan made some attempt at providing a *Miranda* warning, but they disagree as to whether it was done properly. Ultimately, however, Defendant made incriminating statements to the police.

Defendant was arrested and later indicted by a federal grand jury with one count of being a felon in possession of a firearm. He now moves to suppress the evidence seized and all statements he made to the police.

As will be discussed below, there are four main questions in this case. The first is whether Corporal Jones had reasonable suspicion to believe that the Mercedes made an illegal left turn from Laurel Street onto North Ninth Street (the alleged basis for the stop). The second is whether Defendant has standing to complain about the search of the vehicle when he was a mere passenger and the gun was found underneath his seat. The third is whether, if there is standing, there was still probable cause to search the vehicle despite the driver producing a small bag of marijuana and the Defendant saying he swallowed a blunt.[1] And the fourth is whether Defendant's statements to the police were the result of a knowing, voluntary, and intelligent waiver of his *Miranda* rights.

II.     **Discussion on Motion to Suppress Evidence Seized**

        **A.  General Principles**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend.

---

[1] Given the resolution of the first three issues, the Court passes on the question of whether the search was justified under the inevitable discovery doctrine.

IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 653–654, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)). Accordingly, "the Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)).

"While in general, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights, there are several situations where the burden shifts to the government." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). The Fifth Circuit has stated that one situation in which the burden shifts to the Government is when a defendant shows that he was subject to search without a warrant. *Id.* Consequently, because it is undisputed that Defendant was subject to a warrantless search, if he establishes standing, the Government bears the burden of proving the legality of the stop and the warrantless search by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S. Ct. 988, 996, 39 L. Ed. 2d 242 (1974).

### B. Reasonable Suspicion to Conduct the Traffic Stop

#### 1. Parties' Arguments

Defendant first contends that the officers did not have reasonable suspicion to make a traffic stop at the outset. Defendant maintains that their stated reason is "not supported by the officers' body camera footage nor do the police reports authored by the officers provide any detail or context as to the alleged illegal left turn." (Doc. 19-1 at 4.)

The Government responds that the officers had reasonable suspicion to make a traffic stop

at the onset. Again, according to the Government, the officers were stationed under the overpass near the 900 block of Laurel Street. Corporal Jones observed the 2003 Mercedes exit the interstate at the Laurel Street exit and make an illegal left turn onto North Ninth Street. The Government urges that this location is well marked with signs prohibiting left turns.

Defendant replies: "Nothing in the officers' reports or body camera videos support their conclusion that they observed the Mercedes make an illegal left turn. Whether the officers [have] reasonable suspicion to stop the Mercedes is a question of fact to be determined at the evidentiary hearing." (Doc. 22 at 5.)

In post-hearing briefing, Defendant reiterates that Corporal Jones's alleged observations are "not corroborated by his partner and [are] not shown on his body camera recording." (Doc. 36 at 3 (footnote omitted).) According to Defendant, Jones could not have seen the Mercedes make an illegal left turn off I-110 from his position and the obstructions in his view. Defendant emphasizes that the illegal left turn was "nearly a block away" with "numerous trees, several large signs, and parked vehicles in between Jones and the location where the left turn would have occurred." (Doc. 36 at 3.) Defendant also asserts that "Jones's own body camera footage provides the best evidence of his obstructed view," as these videos show "trees and a large white sign directly between Jones and the intersection" at issue. (Doc. 36 at 3.) There was also a white sedan on Laurel Street at the intersection with North Ninth Street which, Defendant says, would have obstructed the view of the Mercedes. The footage also shows the Mercedes in the center lane of North Ninth Street, not the far-left lane. Neither Thomas nor Defendant agree or admit to making the turn, and Sergeant Callihan did not see the turn either. In sum: "Given Jones's obstructed view, the lack of corroboration by his camera or partner, and the evidence contradicting a left turn, Jones was simply mistaken [in] his belief that the Mercedes had turned left." (Doc. 36 at 4.) This may

not have been intentional, but, if wrong, Jones, by his own admission, had no reasonable suspicion to effectuate the stop.

After the Government concedes that Defendant has standing as a passenger to dispute the validity of the stop (Doc. 37 at 1), the Government argues that the video is not the best evidence of the alleged violation. The Government asserts: (1) the "camera was only activated after Corporal Jones witnessed the infraction and was moving toward[] flagging down the vehicle[,]" so "it did not capture the vehicle turning onto [North] Ninth Street nor did it capture the exact view Corporal Jones had at the time he observed the violation" (Doc. 37 at 2.); and (2) "the camera is not positioned in the area of Corporal Jones'[s] eyes/face." (Doc. 37 at 2.) Thus, according to the Government, Corporal Jones's testimony is the best evidence of what he saw. The Government then looks at the video and highlights how it does not support Defendant; for example, Defendant is wrong to say that he would have been in the far left lane, because (1) he falsely assumes that Defendant would have made a proper turn into the appropriate lane of traffic, and (2) the median at the corner of Laurel Street and North Ninth Street would have required a wide left turn, which would have put the Mercedes in the center lane. Moreover, Defendant made a certain statement to the police admitting that Thomas had made an illegal turn and that he was at fault.

Additionally, in its own original post-hearing briefing, the Government details the parts of Jones's testimony that supports reasonable suspicion, including a statement that he had a "clear line of sight from where he was standing to observe the traffic violation," that he was "positive he saw the vehicle illegally turn from the Laurel Street exit ramp, and there is no way to make a legal turn from that intersection." (Doc. 35 at 2 (citations omitted).) Further, while Sergeant Callihan did not observe the illegal turn, he confirmed that there was no legal way to make a left turn from that intersection and that the intersection is clearly marked with signs. The Government also points

to the Defendant's own statements, where he said he could not believe all that happened from a wrong turn.

### 2. Applicable Law

The Fifth Circuit analyzes the constitutionality of traffic stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). *United States v. Berry*, 664 F. App'x 413, 418 (5th Cir. 2016) (per curiam). *Terry* articulated a two-part test, which asks: (1) whether the officer's action was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20, 88 S. Ct. 1868).

As to the first prong, "[f]or a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Henry*, 853 F.3d 754, 756–57 (5th Cir. 2017) (quoting *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013)). "To pass muster, [the officer's] suspicion must have been based on specific and articulable facts and not mere hunches." *United States v. Martinez*, 808 F.2d 1050, 1054 (5th Cir. 1987) (citing *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 694–95, 66 L. Ed. 2d 621 (1981); *Terry*, 392 U.S. at 21, 88 S. Ct. at 1879). Additionally, the Court "must gauge those facts not individually, but in their totality and as seen and interpreted by officers of [the effectuating officer's] experience." *Id.* (citations omitted). Lastly, "[r]easonable suspicion can rest on a mistake of law or fact if the mistake is objectively reasonable." *Henry*, 853 F.3d at 757 (citing *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015)).

### 3. Analysis

Having carefully considered the law and facts in the record, the Court finds that the Government has sustained its burden of proving that Corporal Jones had reasonable suspicion to believe that the Mercedes made an illegal left turn from Laurel Street onto North Ninth Street. The Court bases this conclusion largely on Jones's testimony, which the Court found highly credible.

Specifically, Jones testified that, on the day in question, he was "working a seat belt enforcement grant overtime" and was positioned so that he was "standing on 9th Street pretty much directly across from the courthouse here facing northbound watching southbound traffic approach and also the exit ramp." (Tr. 9, Doc. 34.) Thus, Jones's specific purpose on the day in question was to watch the area where the alleged violation occurred to spot seat belt and "other traffic violations." (Tr. 27–28, Doc. 34.)

Jones further testified that, in the first stop he made that day, he "[o]bserved a vehicle exit the interstate onto Laurel Street and then make a left turn from the Laurel Street exit ramp onto 9th Street." (Tr. 9, Doc. 34.) The car did this despite the prohibition on left-hand turns at that intersection and the four signs indicating as such. (Tr. 9–10, 23, Doc. 34.) After observing the violation, Jones stepped in front of the vehicle and motioned for it to pull into the parking area under the interstate. (*Id.*)

Also important, Jones specifically responded to the concerns Defendant is now raising. Jones testified:

Q. Okay. Now, in between where you're standing and where the Mercedes, you say, took the left-hand turn there's a lot of things that obstruct your view; isn't that right?

A. There are things there, but we do have a clear line of sight from this location.

(Tr. 29, Doc. 34.) Similarly, Jones said:

Q.     Are you positive that you saw it turn from the Laurel Street exit ramp?

A.     Yes.  If it had not turned from the ramp it would not have been stopped. If it had not made a left turn at that intersection the way it did it would have never been stopped.

. . .

Q.     And you're sure you had a clear sign of view at that vehicle, correct?

A.     Yes. I can see over the cars.

(Tr. 55–56, Doc. 34; *see also* Tr. 54–55 & Def. Ex. 9-a (Jones stating that there was no way for the Mercedes to turn legally and to be where it was on North Ninth Street.)  The Court listened closely to Jones's testimony and observed his demeanor, and the Court found him highly believable on these critical facts.

Additionally, the Court disagrees with Defendant and finds that the camera is not the best evidence of the traffic violation.  As the Government explained, the vehicle did not capture the turn itself, and, indeed, the camera is not even pointed at the intersection at the start of the video because Jones is walking toward and facing North Ninth Street. (*See* Gov't Ex. 1 0:00–0:45.) Further, it's also clear from the beginning of the footage that the camera is not positioned on Jones's head, and this reinforces the fact that the footage is not dispositive of what Jones saw when the illegal turn was made. (*See id.*) Lastly, the Court agrees with the Government that there is a plausible explanation for the Mercedes being in the center lane at the beginning of the video, given the median in between the two lanes on Laurel Street and the high likelihood that, if Defendant made an illegal left turn, it would be wide. (*See id.* 0:00–0:10; Def. Ex. 9.)

It's also important to note that parts of the video actually confirm that Thomas made an illegal left turn.  Jones specifically tells Thomas on the video that he is going to "get a citation for the turn because there are four signs starting at the top of the exit ramp coming all the way down that say do not make a left turn." (Gov't Ex. 1-a, 5:48–6:05.)  This is noteworthy for two reasons.

First, Thomas does not deny making the illegal left turn, and, second, Jones sounds confident and believable when he tells Thomas this information. Thus, the video actually supports the conclusion that the Mercedes made an illegal left turn.

Defendant's other evidence also fails to rebut Jones's testimony. The satellite (Def. Ex. 9) and Google Maps street photo (Def. Ex. 10) show that there were indeed obstructions like cars, signs, and trees in the area. However, none of those photographs prove that Jones could not see the Mercedes make the illegal turn from his vantage point (Def. Ex. 9-a; Tr. 26–27, Doc. 34.) Even if the inference could be made that these obstructions could block Jones's view, the Court again found him highly believable when he said he had a clear line of sight, particularly given the fact that, again, he was out that day specifically trying to enforce traffic laws like the one at issue.

In sum, the Court finds that the Government has proven by a preponderance of the evidence that Corporal Jones had reasonable suspicion to believe that the Mercedes in which Defendant was traveling made an illegal left turn across Laurel Street onto North Ninth Street. As a result, this part of Defendant's motion to suppress is denied.

### C. Standing to Dispute the Search

#### 1. Parties' Arguments

The Government argues that, though Defendant has standing to contest the legality of the stop, he does not have standing to contest the validity of the search because he was a passenger in the vehicle. The key is whether Defendant had an actual, subjective expectation of privacy in the area searched or evidence seized and whether that expectation was objectively reasonable. Looking at the relevant factors, Defendant lacks standing to attack the search.

In reply, Defendant looks at the same test articulated by the Government ((1) actual, subjective belief in privacy (2) that is objectively reasonable). As to the first prong, Defendant

was riding in the vehicle with the consent of the owner and with his expectation, and the gun was found under the very seat in which he was sitting. Further, Defendant argues that his expectation of privacy was reasonable because it is protected by the Louisiana Constitution, and it would create a perverse situation for such searches to be protected in state court but not federal court. Lastly, Defendant notes the absurdity of the Government charging the defendant for a gun he possessed under the front seat but at the same time claiming he has no expectation of privacy there.

In post-hearing briefing, the Government first emphasizes that Defendant has the burden of establishing standing and that "[t]ypically, a passenger with no possessory interest in a vehicle lacks standing to challenge a search of that vehicle." (Doc. 35 at 3 (citation omitted).) The Government then asserts that there is no evidence of any possessory interest in the firearm or vehicle. Defendant can only point to the fact that the officers said that Defendant appeared to be a welcome passenger in the vehicle and that the car was registered to Thomas's mother. But, "no testimony was elicited and no evidence was presented to indicate who positively owned the car, whether Thomas had permission to drive what was presumably his mother's car, or whether that permission was extended to the defendant." (Doc. 35 at 3.) The Government relies on *Rakas v. Illinois*, 439 U.S. 128 (1978) and argues that *Rakas* is "remarkably similar to the instant case." (*Id.* at 4.) The Government also distinguishes the two cases relied upon by the Defendant in his reply brief—*Untied States v. Martinez*, 808 F.2d 1050 (5th Cir. 1987) and *United States v. Turner*, 839 F.3d 429 (5th Cir. 2016); here, even assuming Thomas had permission to use the vehicle, there was no evidence that defendant was ever a possessor of the vehicle, and the gun was not in any kind of bag. (*See* Doc. 35 at 4–5.)

Defendant reiterates in his post-hearing brief that he meets the two-part test for standing. He was a "welcome passenger in the Mercedes" driven by Thomas. (Doc. 36 at 1.) Further,

Defendant is challenging a search of the area under his own seat. Defendant clearly had a subjective expectation of privacy there, as "he chose to hide the gun—out of view—underneath the seat in an attempt to exercise his privacy rights." (Doc. 36 at 2 (footnote and citation omitted).) Defendant then reiterates that his expectation is objectively reasonable because it is expressly protected by the Louisiana Constitution.

The Government replies that it is not denying that passengers can have standing; rather, this Defendant does not have standing under the facts of this case. The Government again urges that the Defendant's cases are distinguishable. Finally, the Government maintains that Defendant's protection under state law does not automatically confer standing in this federal case, as the Supreme Court has rejected any theory of "automatic standing."

## 2. Applicable Law

"In order to claim the Fourth Amendment's protection, a defendant must have 'a legitimate expectation of privacy in the invaded place.' " *United States v. Iraheta*, 764 F.3d 455, 461 (5th Cir. 2014) (quoting *United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011)). " 'The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.' " *Id.* (quoting *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)). "A defendant's 'expectation must be "personal[ ]" and "reasonable," and it must have a "source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." ' " *Id.* (quoting *Hernandez*, 647 F.3d at 219 (alteration in original) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998))). "In other words, a defendant's standing 'depends on 1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being

seized, and 2) whether that expectation of privacy is one which society would recognize as [objectively] reasonable.' " *Id.* (quoting *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037–38 (5th Cir. 1990) (citation omitted)).

" 'Standing does not require an ownership interest in the invaded area[.]' " *Id.* (quoting *Hernandez*, 647 F.3d at 219). "The 'factors to be weighed' " in determining whether there is a reasonable expectation of privacy " 'include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.' " *United States v. Gomez*, 276 F.3d 694, 697–98 (5th Cir. 2001) (quoting *United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir. Unit A Jul. 1981)). "No one circumstance has a decisive 'talismanic' significance." *Id.* at 698 (quoting *Haydel*, 659 F.2d at 1155).

The Fifth Circuit has "recognized that 'passengers who assert[ ] neither a property nor a possessory interest in the automobile that was searched, nor any interest in the seized property, ha[ve] no legitimate expectation of privacy entitling them to the protection of the [F]ourth [A]mendment.' " *Iraheta*, 764 F.3d at 461 (quoting *United States v. Greer*, 939 F.2d 1076, 1093 (5th Cir. 1991) ("Wood and Jordan have no standing to object to the search of the car or its passengers. They were only passengers in the truck, and they never claimed a possessory or ownership interest in the vehicle or its contents.")); *United States v. Winters*, No. 09-64, 2009 WL 4664128, at *2 (W.D. La. Dec. 4, 2009) (finding that defendant lacked standing when he told officers that "the car belonged to his sister, she had been driving it, he had not driven it that day, and she had left the car and the area on foot" and "when the officers ran the license plate of the

vehicle, the car came back registered to [his] sister"); *United States v. Williams*, No. 14-576, 2015 WL 12966225, at *3 (S.D. Tex. Jan. 5, 2015) (finding that, though driver who borrowed tractor from owner had standing, passenger who had not driven the tractor did not, even though he accompanied the driver at driver's "request to assist with driving back to their origin in Houston following their trip to Laredo"); *cf. United States v. Wise*, 877 F.3d 209, 218 (5th Cir. 2017) ("Passengers traveling on commercial buses resemble automobile passengers who lack any property or possessory interest in the automobile. Like automobile passengers, bus passengers cannot direct the bus's route, nor can they exclude other passengers. [(citation omitted)] Bus passengers have no possessory interest in a bus's passenger cabin—except with regard to their personal luggage. Any reasonable expectation of privacy extends only to that luggage. Passengers have no reasonable expectation of privacy with respect to the bus's cabin.")

### 3. Analysis

Having carefully considered the matter, the Court finds that Defendant lacks standing to contest the search of the Mercedes. Even assuming that Thomas had permission from his mother (the purported registered owner (*see* Tr. 18, Doc. 34; Gov't Ex. 1-a, 5:30–5:42)), and even assuming that Defendant was a "welcome passenger in the car" (Tr. 91, Doc. 34), the numerous cases cited above illustrate that mere passengers lack standing to attack an automobile search. *See, e.g., Greer*, 939 F.2d at 1093; *Williams*, 2015 WL 12966225, at *3. Thus, Defendant's standing argument fails as a matter of law.

While Defendant is correct that passengers can have standing under certain circumstances, those circumstances are not present in this case. For example, a passenger of a vehicle, using the car with the owner's permission, has standing as a lawful possessor of the car to challenge a search of the vehicle. *See United States v. Martinez*, 808 F.2d 1050, 1056 (5th Cir. 1987) (citations

omitted). The Fifth Circuit later characterized *Martinez*'s holding as: "where a person has borrowed an automobile from another, with the other's consent, the borrower becomes a lawful possessor of the vehicle and thus has standing to challenge its search." *Kye Soo Lee*, 898 F.2d at 1038 (finding that defendants had standing because they were "operating the truck with [the owner's] permission" and because the owner had given the defendants "the keys to the truck and entrusted the vehicle and its contents to" them). Thus, *Kye Soo Lee* demonstrates that *Martinez* is distinguishable from the instant case because, unlike *Martinez*, this was not a situation where Defendant borrowed an automobile from the owner with the owner's consent.

Similarly, the Fifth Circuit has found that a passenger who jointly possessed an item with the driver and that kept that item in a bag under his seat had standing to challenge a search. *See United States v. Turner*, 839 F.3d 429, 432 (5th Cir. 2016). But *Turner* is not controlling because, again, Defendant freely concedes that the gun was not in a bag of any kind. Defendant laments that the presence or absence of a bag should not be controlling, but this is the line the case law has drawn.

*Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) further illustrates the weakness of Defendant's position. In *Rakas*, a vehicle had been pulled over by police officers following an armed robbery. *Id.* at 130. Defendants were occupants of the vehicle. *Id.* Police officers searched the car, and they found a box of rifle shells in the locked glove compartment and "a sawed-off rifle under the front passenger seat." *Id.* Defendants challenged the search; though they acknowledged that they did not own the vehicle, rifle, or shells, they claimed standing. *Id.* The lower courts rejected the challenge to the search for lack of standing. *Id.* at 131.

The Supreme Court affirmed. The High Court explained:

[P]etitioners' claims must fail. They asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized. And as we have

previously indicated, the fact that they were "legitimately on [the] premises" in the sense that they were in the car with the permission of its owner is not determinative of whether they had a legitimate expectation of privacy in the particular areas of the automobile searched.

*Rakas*, 439 U.S. at 148. The Court went on to reject any analogy to the search of a dwelling, in part because the defendant passengers had no reasonable expectation of privacy in the areas where the evidence was found:

> [H]ere petitioners' claim is one which would fail even in an analogous situation in a dwelling place, since they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers. Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy.

*Id.* at 148–49 (citation omitted).

The Court also rejects Defendant's argument that his state-law right to privacy somehow confers standing in this federal action. Defendant has the burden of establishing standing, and he has not cited a single authority supporting this contention. Conversely, the weight of authority (set out above) strongly demonstrates that there is no standing for a mere passenger like Defendant.

Further, Defendant complains in pre-hearing briefing that the Government cannot argue that he lacked standing when he is charged with the crime of possession of a firearm, but this argument appears foreclosed by *United States v. Salvucci*, 448 U.S. 83, 85, 100 S. Ct. 2547, 2549, 65 L. Ed. 2d 619 (1980). There, the Supreme Court overruled the "automatic standing" rule of *Jones v. United States*, 362 U.S. 257, 80 S. Ct. 725 (1960), which had given defendants charged with crimes of possession the right to challenge the legality of the search which produced the evidence against them, regardless of any expectation of privacy. *Salvucci*, 448 U.S. at 85. Instead, in *Salvucci*, the Supreme Court held that "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been

violated." *Id.* The High Court explained: "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, [(*Rakas, supra*),] property rights are neither the beginning nor the end of [the] Court's inquiry[.]" *Id.* at 91. The Supreme Court "simply decline[d] to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." *Id.* at 92.

Finally, even if standing were not foreclosed by all of the above law, the factors used to determine whether there is a reasonable expectation of privacy, *Gomez*, 276 F.3d at 697–98, still weigh against Defendant. Defendant has pointed to no evidence that he had a possessory interest in the place searched. It's also inconclusive that Defendant was "legitimately on the premises," as he has pointed to no evidence that Thomas had permission to drive the car allegedly belonging to his mother or that such permission extended to the Defendant. There is certainly no evidence Defendant had any power to exclude others from the vehicle. Even if Defendant "exhibited a subjective expectation" that the gun would be free from "governmental invasion" and took "normal precautions to maintain his privacy" (arguments that appear foreclosed by *Rakas*), the factors still weigh in favor of the Government.

For all these reasons, the Court finds that Defendant lacks standing to complain about the search of the Mercedes. On this ground alone, Defendant's motion to suppress the evidence from the search could be denied.

### D.  Probable Cause to Search the Vehicle

Nevertheless, even assuming Defendant had standing, his motion to suppress the evidence could be denied on an additional ground. Specifically, Sergeant Callihan had probable cause to search the automobile. *See United States v. McMillon*, 657 F. App'x 326, 332 (5th Cir. 2016) ("We

need not reach this novel argument [on standing]. Even assuming *arguendo* that McMillon has standing, each of his challenges to the search clearly fail.").

## 1. Parties' Arguments

Defendant argues that the officers lacked probable cause to search the Mercedes. According to Defendant, the purported traffic stop does not create probable cause, and, more importantly, "[a]ny suspicion for possession of marijuana was quelled when the driver turned over the marijuana and Mr. Williams admitted to swallowing the remaining blunt. At that point, officers did not have probable cause to conduct a warrantless search of the vehicle." (Doc. 19-1 at 4.) Defendant closes by emphasizing that the Government has the burden of establishing probable cause.

In response, the Government relies on the automobile exception, which allows officers to search a vehicle if there is probable cause to believe there is contraband or evidence of criminal activity. According to the Government, the Fifth Circuit has found that the mere smell of marijuana is, by itself, enough to establish probable cause to search both the vehicle and any compartments likely to contain it. (Doc. 21 at 6 (citing *United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989); *United States v. Ross*, 456 U.S. 798, 825 (1982)). Here, the odor of marijuana gave the officers the probable cause they needed to search the vehicle. While the bag was produced, neither the Defendant nor the driver provided the blunt. Further, the Government maintains:

> Defendant's main argument hinges on the fact that because the driver tendered a small bag of marijuana and Williams claimed he had eaten the marijuana blunt, officers no longer had reason to believe the vehicle contained additional marijuana. However, this Court has held that locating marijuana in plain view in a vehicle provides additional justification for searching the entire vehicle for additional contraband when considered in connection with the smell of marijuana. *United States v. Banks*, 2012 WL 3255596 (M.D. La. 2012). It was reasonable for the officers to search any area of the vehicle that could contain evidence of marijuana

possession even though the driver tendered one small bag, and they are not required to cease the search just because they have located **some** contraband.

As Sgt. Callihan looked into the front passenger door of the vehicle, he observed the butt of the Glock protruding from under the seat along with suspected marijuana gleanings on the floorboard. Once he recovered the Glock, he also observed and recovered a marijuana blunt. Because the space under the seat was a location that could contain additional marijuana, and in fact did contain a marijuana blunt, the search did not exceed the scope of the probable cause developed in this case.

(Doc. 21 at 7 (emphasis in original).)

Defendant replies that, while the Fifth Circuit has held that the smell of marijuana justifies a search, they have not dealt with the issue here: whether there is still probable cause "where the smell of marijuana justification had dissipated before the search was conducted." (Doc. 22 at 5–6 (citing *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988).)  Here, "[t]he probable cause for possession of marijuana was quelled in this case when the driver turned over the marijuana and Mr. Williams admitted to swallowing the remaining blunt. At that point, officers did not have probable cause to conduct a warrantless search of the vehicle." (*Id.* at 6.)

In post-hearing briefing, the Government again emphasizes that the "mere smell of marijuana, without more, can provide probable cause to search a vehicle, including any compartments likely to contain the contraband." (Doc. 35 at 5–6 (citations omitted).)  The Government then chronicles how the officers smelled marijuana coming from the vehicle.  The Government also highlights how Callihan said that, "in his experience, sometimes suspects give law enforcement officers some contraband in hopes that more isn't located." (Doc. 35 at 6 (citation omitted).)  The Government concludes:

It was reasonable for the officers to search any area of the vehicle that could contain evidence of marijuana possession even though the driver tendered one bag, and they were not required to cease the search just because they have located **some** contraband.  Sgt. Callihan located the firearm under the front passenger seat, an area that additional marijuana could be found and, in fact, was found.

(Doc. 35 at 6.)

In his post-hearing briefing, the Defendant asserts: "When Officer Callihan searched the Mercedes and discovered the gun, the probable cause to search the vehicle had dissipated because all of the marijuana known to the officers had been accounted for." (Doc. 36 at 5.) Defendant argues again that Thomas produced a small bag of marijuana and that Williams ate the blunt. Thus, even though the officers smelled marijuana, the "probable cause created by that smell . . . had dissipated and could not be used as probable cause." (Doc. 36 at 5 (citations omitted).) Without the smell, Callihan had only a gut feeling, which is not enough to establish probable cause.

In reply, the Government agrees that officers "cannot disregard facts tending to negate probable cause." (Doc. 37 at 4 (citation omitted).) But, probable cause is not based on "isolated facts, such as the defendant merely saying he ate the marijuana blunt, but rather on the totality of the circumstances and the total of layers of information available to the law enforcement officer."

(*Id.*) The Government asserts:

> Despite using the word "gut," Sgt. Callihan detailed the reasons for why he did not believe that the defendant ate the missing marijuana blunt. In addition to the testimony cited in the United States' Post-Hearing Brief, Sgt. Callihan testified that his suspicion was further supported by his 21 years of experience, the clippings he observed on the floorboard by the defendant's feet, the cigarillo pack, and the fact that he wasn't swallowing or eating anything when approached by Sgt. Callihan. Tr. P. 67 Lns. 1-15; P. 71-72 Lns. 21-2; P. 97 Lns. 1-5.

(*Id.*) Additionally, Defendant's contention that he was willing to admit to a felony despite the fact that he was subjected to a felony is misplaced. While obstruction of justice is a felony under state law, it is not as serious as the offenses of being a felon in possession and illegally carrying a weapon while in possession of a controlled substance. Both of those crimes carry mandatory minimums. Thus, Defendant had incentive to lie.

## 2. Applicable Law

Under the "automobile exception," "in cases where there was probable cause to search a vehicle 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained.*' " *Maryland v. Dyson*, 527 U.S. 465, 466–67, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999) (per curiam) (emphasis in original) (quoting *United States v. Ross*, 456 U.S. 798, 809, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982)). "A warrantless search is permissible under the automobile exception if (1) the officer conducting the search had 'probable cause to believe that the vehicle in question contain[ed] property that the government may properly seize'; and (2) exigent circumstances justified the search." *United States v. Berry*, 664 F. App'x 413, 420 (5th Cir. 2016) (per curiam) (quoting *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (alteration in original) (quoting *United States v. Reyes*, 792 F.2d 536, 538 (5th Cir. 1986))).

Concerning the first prong, "[p]robable cause to search an automobile exists where 'trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband'." *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (quoting *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978) (en banc)). "A determination of probable cause is also based on the totality of circumstances and must be predicated on more than a 'bare suspicion.' " *United States v. Guerra*, 605 F. App'x 295, 297 (5th Cir. 2015) (citing *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)). However, "if, under the totality of the circumstances, officers have probable cause to believe that a vehicle contains contraband, they are authorized to search [it] without a warrant." *United States v. Sinisterra*, 77 F.3d 101, 105 (5th Cir. 1996) (citations omitted).

Again, "[p]robable cause determinations are not to be made on the basis of factors considered in isolation, but rather on the totality of the circumstances." *United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989) (citing *Illinois v. Gates,* 462 U.S. 213, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)). " '[P]robable cause is the sum total of layers of information' available to law enforcement officials." *Id.* (quoting *United States v. Edwards,* 577 F.2d 883, 895 (5th Cir. 1978) (en banc)). "The factors relevant to probable cause are not technical ones, but rather 'factual and practical ones of everyday life on which reasonable and prudent persons, not legal technicians, act.' "[2] *Id.* (quoting *United States v. Tarango–Hinojos,* 791 F.2d 1174, 1176 (5th Cir. 1986)). "Furthermore, a 'trained officer draws inferences and makes deductions . . . that might well elude an untrained person,' and evidence collected 'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " *Id.* (citing *United States v. Cortez,* 449 U.S. 411, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981)). Ultimately, "[w]hether an officer has probable cause to search a vehicle depends on the totality of the circumstances viewed 'in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search.' " *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995) (quoting *United States v. Muniz–Melchor*, 894 F.2d 1430, 1438 (5th Cir. 1990)).

The law in the Fifth Circuit is clear: if officers smell marijuana coming from inside the vehicle, they have probable cause to search the vehicle. *See United States v. Lork*, 132 F. App'x 34, 35-36 (5th Cir. 2005) (per curiam) (holding that, after conducting lawful traffic stop for speeding, officer detected odor of marijuana emanating from defendant's vehicle, thereby creating

---

[2] Or, as Justice Holmes said, "The life of the law has not been logic: it has been experience." OLIVER WENDELL HOLMES, *The Common Law* (1881)*, reprinted in* THE MIND AND FAITH OF JUSTICE HOLMES 51 (Max Lerner ed., 1989).

probable cause to search vehicle); *McSween*, 53 F.3d at 686 ("Indeed, the smell of marihuana alone may be ground enough for a finding of probable cause, as this Court has held many times." (citing *Reed*, 882 F.2d at 149 ("More importantly, [the agent] detected the distinct odor of burnt marihuana, and this in itself would have justified the subsequent search of Reed's vehicle." (citations omitted)); *United States v. Henke*, 775 F.2d 641, 645 (5th Cir.1985) ("Once the officer smelled the marijuana, he had probable cause to search the vehicle."); *United States v. Gordon*, 722 F.2d 112, 114 (5th Cir.1983) (same); *United States v. McLaughlin*, 578 F.2d 1180, 1183 (5th Cir.1978) (same)); *United States v. Paul,* No. 16-131, 2017 WL 2200908, at *7 (M.D. La. May 19, 2017) (deGravelles, J.) ("the smell of marijuana gave the officers probable cause to search the entire vehicle." (citing *McSween*, *supra*)); *United States v. Henry*, No. 15-26, 2015 WL 6479029, at *4 (M.D. La. Oct. 27, 2015) (deGravelles, J.), *aff'd*, 853 F.3d 754 (5th Cir. 2017) (finding, where officer detected marijuana odor emanating from car after lawful traffic stop for minor traffic infraction, that odor provided probable cause to search car) (citing *Reed*, 882 F.2d at 149; *United States v. Hahn*, 849 F.2d 932, 935 (5th Cir. 1988); *United States v. Sawyer*, 849 F.2d 938, 940 (5th Cir. 1988)).

### 3. Analysis

Even assuming that the Defendant had standing (which he does not), the Court finds that the Government has satisfied its burden of proving that there was probable cause to search the vehicle. Thus, Defendant's motion must be denied.

First, the facts demonstrate that Corporal Jones and Sergeant Callihan smelled marijuana coming from the vehicle. Specifically, Corporal Jones testified that, when he first contacted Thomas and asked him to step out of the vehicle, "there was the strong odor of marijuana emitting from the interior compartment of the vehicle." (Tr. 11, Doc. 34.) Jones also told Thomas that he

smelled the marijuana, and, in response, Thomas produced the bag of marijuana. (*Id.*; *see also* Gov't Ex. 1-a, 3:10–3:15 (Jones telling Thomas that he can "smell it").) Even after Thomas produced the bag, Jones still smelled an odor of marijuana. (Tr. 12, Doc. 34.) Likewise, Callihan testified, "As I opened the door you get a smell of marijuana." (Tr. 60, Doc. 34.) Under all of the above case law, this alone justifies the search of the vehicle. *See, e.g., Lork*, 132 F. App'x at 35–36; *McSween*, 53 F.3d at 686; *Henry*, 2015 WL 6479029, at *4.

Putting this aside, other facts also support a finding of probable cause. Thomas said that, while he and Defendant were driving, they were rolling a blunt and that Jones should ask Defendant about it. (Tr. 13, Doc. 34.) According to Jones, Defendant said he "ate the blunt because he panicked when [Jones] pulled him over[.]" (Tr. 41, Doc 34.) Critically, Callihan testified:

> Q. Have you ever had a situation where they've tendered some of the drugs to distract from you finding additional contraband? . . . Like in this case, gave a bag and you ended up finding more drugs.
>
> A. Oh. Yes, ma'am. Yes, ma'am. Yes.
>
> Q. So did you know for a fact that he'd eaten the blunt?
>
> A. No.
>
> Q. Did anything seem to indicate that he had just swallowed a blunt?
>
> A. No, ma'am.

(Tr. 65, Doc. 34; Gov't Ex. 1-b, 0:30–0:37 (Jones telling Callihan after the marijuana was found that Defendant "said he ate it because he was hoping to save it.")).

Callihan was also asked why he searched the vehicle, and he replied:

> Just because of the way the whole stop went down and some of the statements made, I just felt through all that that there was more to be – with the clippings on the floorboard at his feet, with the cigarillo pack, with the lighters located, with the fact that he said he was eating and swallowing some of the weed but I didn't see

> any of that going on, with the driver admitting that there was a blunt that was missing but yet we hadn't found it yet, all that.

(Tr. 67, Doc. 34.)  With respect to the cigarillo package, Callihan stated, "Typically those are purchased and they're gutted and the guts are removed and then it's repackaged with marijuana and smoked." (Tr. 60–61, Doc. 34.)  Callihan has encountered this method in his experience in narcotics. (Tr. 61, Doc. 34.)  With respect to the clippings, Callihan explained: "Typically when they cut the cigars open there's a mess that's made.  Whether it be from the tobacco being removed from the cigarette or whether it be the weed itself being put in, there's typically ashes and mess left behind that." (Tr. 67, Doc. 34.)  Callihan observed this on the floorboard where Defendant had been sitting. (*Id.*; *see also* Tr. 106–07, Doc. 34.)

> Later, Callihan elaborated on why he suspected that Defendant had not ingested the blunt:
>
> Just, like I said, my first contact with him when I was approaching the car.  His hands stayed down, the most part.  They didn't really move.  His attention was drawn toward the driver's side.  So I was able to kind of just kind of watch to see, in any case, of just whatever and I never really saw  -- like I said, I didn't see him chew, swallow.  When I opened the door to talk to him there was nothing in his mouth.  There was nothing that would lead me to believe that that's what happened.

(Tr. 71–72, Doc. 34; *see also* Tr. 64, Doc. 34 (Callihan testifying that, when he first came into contact with Defendant, he was not chewing or swallowing, and there was nothing in his teeth).)

The Court listened to the officers' testimony and observed their demeanor on the stand.  The Court found both Jones and Callihan to be highly credible on these issues.  Additionally, the Court reviewed the videos in evidence, and they confirm the Court's conclusions that there was probable cause to search the vehicle.

The Court also rejects Defendant's argument that probable cause dissipated because Thomas produced a bag of marijuana and because Williams said he ate a blunt, despite being told

that this was a felony. (Gov't Ex. 1-a, 3:00–3:35, 7:00–7:50.)  Aside from these facts, Defendant

relies on *Bigford v. Taylor*, 834 F.2d 1213 (5th Cir. 1988) in support of his argument.

But *Bigford* does not warrant a finding in favor of Defendant, legally or factually.  Legally,

*Bigford* stands for the proposition that, "[a]s a corollary . . .  of the rule that the police may rely on

the totality of facts available to them in establishing probable cause, they also may not disregard

facts tending to dissipate probable cause." *Id.* at 1218.   That is, *Bigford* stands for the simple

proposition that the Court must consider the totality of the circumstances, including facts tending

to negate a finding of probable cause.   However, here the Court has considered all of the facts

highlighted by the Defendant as well as those emphasized by the Government and still finds that

the weight of the evidence goes to the Government.

Further, factually, *Bigford* is distinguishable.  There, the Fifth Circuit reversed the district

court's conclusion that there was probable cause that the vehicle was stolen because the safety

sticker was missing and the VIN had been altered; these facts were, at best, a cause for further

investigation, not probable cause of a stolen car, and "[m]inimal further investigation . . .would

have reduced any suspicion created by the facts the police had discovered." *Id.* at 1218–19.  The

need for further inquiry was particularly apparent "when the nationwide computer search produced

no report that the vehicle matching either the VIN or the license plates on [defendant's] truck had

been reported stolen." *Id.* at 1219.  Other facts also dissipated any finding of probable cause, such

as the old age and bad condition of the vehicle making it an unlikely target for theft. *Id.*  Thus, in

*Bigford*, there were far more facts tending to dissipate a finding of probable cause than in the

instant action.

Additionally,  the Court  also accepts Callihan's  explanation for using the word "gut."

(Gov't Ex. 1b, 9:30–9:40.)  Callihan said:

Well, that's the term I used, yes; but that's – it's 21 years, it's the way he answers the question, the total package. I decided to say – I didn't think I needed to go in - - I guess elaborate on the whole why. I just—the word gut just was easier to say.

(Tr. 97, Doc. 34.) The Court finds this explanation believable; "gut" was shorthand for Callihan's 21 years of experience with the Baton Rouge City Police, time which included work in the narcotics, uniform patrol, bike division, and traffic divisions. (Tr. 57, Doc. 34.) "Gut" also referred to all the facts he articulated at the evidentiary hearing. (Tr. 67, 71–72, Doc. 34.)

Finally, the Court again emphasizes Sergeant Callihan's testimony that, in his considerable experience, there have been instances where people have "tendered some of the drugs to distract from you finding additional contraband . . . [l]ike in this case, gave a bag and you ended up finding more drugs." (Tr. 65, Doc. 34.) Callihan echoed Corporal Jones, who said that he initially checked part of the interior of the car "[t]o ensure there was nothing further illegal in the vehicle" and that "[i]t's been experiences (sic) where a person will voluntarily hand something over but we have found more in the vehicle later." (Tr. 12, Doc. 34; *see also* Tr. 38, Doc. 34.) The Court finds this very reasonable as a matter of common sense, and Defendant has pointed to no case which mandates a different result.[3]

In sum, even if the Defendant had standing, the Court finds that the Government has met its burden of showing that Callihan had probable cause to conduct the search that led to his finding the firearm. As a result, Defendant's motion to suppress is denied.

## III. Discussion on Motion to Suppress Statements Made

### A. Parties' Arguments

In its original opposition, the Government argues that, though Defendant has not

---

[3] While of course not a factor, it's worth noting that Callihan's belief that there was additional contraband was confirmed, as there was more marijuana found under the seat near the gun. (Tr. 69–70, Doc. 34; Gov't Ex. 1-a, 11:55–12:05.)

demonstrated a basis for suppressing his statements, the Government has the burden of showing that Defendant knowingly and voluntarily waived his *Miranda* rights. The Government notes that Callihan advised Defendant of his *Miranda* rights and that Defendant "voluntarily, knowingly, and intelligently" waived them with respect to his statements about possessing the firearm.

Defendant replies that this issue was a question of fact to be resolved at the evidentiary hearing. The Government has the burden of showing compliance with *Miranda*. Defendant stated that he intended to demonstrate at the hearing that he did not knowingly waive his *Miranda* rights before making incriminating statements.

In post-hearing briefing, the Government asserts that it met its burden of showing that Callihan fully advised Defendant of his rights. According to the Government, Callihan testified that he advised Defendant of "(1) his right to remain silent; (2) that anything he said could be used against him in a court of law; (3) that he had a right to an attorney; and (4) that one would be appointed for him if he could not afford one." (Doc. 35 at 7 (citing Tr. 103–104, Doc. 34).) Even though Callihan did not advise Defendant that he had the right to stop answering questions and did not ask if he understood those rights, Callihan complied with *Miranda*. The Government maintains that, legally, waivers can be implicit through the defendant voluntarily answering questions. Under the totality of the circumstances, Defendant appeared to understand his rights; Defendant did not appear to be under the influence of any drugs, did not have slurred speech, responded coherently and appropriately to questioning, and had been arrested previously and thus had a familiarity with the justice system. Again, Defendant volunteered much information, so, for all these reasons, he implicitly waived his rights.

Defendant responds that Jones did not advise Defendant of his *Miranda* rights prior to questioning him. Instead, Jones relied on Callihan's representation that he advised Defendant of

his rights. According to Defendant, "[t]here is no indication that Callihan's *Miranda* warning was heard or understood by Williams, nor did Williams affirmatively waive his *Miranda* rights in any way." (Doc. 36 at 7.) Defendant says the body camera is the best evidence of the *Miranda* warning. Additionally, Callihan admitted that he did not say that Defendant had the right to stop questioning and did not ask Defendant if he understood his rights. Defendant never nodded or responded to the warning, and he was never given another warning. Finally, the fact that Defendant later answered questions is not probative of whether he understood his rights, as none of that demonstrates whether Callihan "heard, understood, or waived *Miranda*." (Doc. 36 at 8–9.) In closing: "With no evidence that Williams heard, understood, or waived his *Miranda* rights, his statements must be suppressed." (Doc 36 at 9.)

**B. Applicable Law**

The Fifth Amendment provides in relevant part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda*, the Supreme Court concisely laid out its holding with respect to this amendment as follows:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not

deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

*Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966).

"There is no talismanic incantation of phrases required to satisfy the strictures of *Miranda*." *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005) (citing *California v. Prysock*, 453 U.S. 355, 359, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981)). "Nevertheless, the *Miranda* safeguards are 'most commonly satisfied by giving the defendant the customary *Miranda* warnings: That he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that an attorney will be provided for him if he cannot afford to hire one.' " *Id.* (quoting *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)).

"A valid *Miranda* waiver requires two distinct components." *United States v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009). " 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' " *Id.* (quoting *Cardenas*, 410 F.3d at 293 (citation omitted)). " 'Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Id.* (quoting *Cardenas*, 410 F.3d at 293). The Government has the burden of proving a waiver of the Defendant's *Miranda* rights by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S. Ct. 515, 522–23, 93 L. Ed. 2d 473 (1986).

Waivers can be done implicitly. For example, in *Hearn*, the Fifth Circuit affirmed the district court's decision that the defendant knowingly and voluntarily waived her *Miranda* rights. *Hearn*, 563 F.3d at 104. The appellate court summarized the relevant facts as follows:

> [F]our undercover officers approached Collins as she was entering the parking lot of the Diamond Jacks Casino; they identified themselves as officers; escorted Collins into the parking garage; told her that they were investigating methamphetamine distribution; advised Collins of her *Miranda* rights; and asked her questions which she voluntarily answered.

*Id.* Analyzing this, the Fifth Circuit explained: "Nothing about these facts suggests that Collins's decision to answer the officers' questions resulted from intimidation, coercion, or deception. Collins was fully apprised of her *Miranda* rights and chose to waive those rights by answering the officers' questions." *Id.* (citing *North Carolina v. Butler,* 441 U.S. 369, 374–76, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) (rejecting argument that *Miranda* waivers can never be implicit); *United States v. Cazares,* 121 F.3d 1241, 1243 (9th Cir. 1997) ("To solicit a waiver of *Miranda* rights, a police officer need neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights.")). Additionally, the Fifth Circuit noted that "Collins had extensive experience with law enforcement as evidenced by her criminal history category, and nothing in the record indicates that she lacked average intelligence or education." *Id.* The appellate court concluded, "Thus, by choosing to answer the officers' questions, Collins demonstrated her intent to forfeit the *Miranda* rights she had just been read. The district court considered the evidence and concluded that the consents were knowingly and voluntarily given. We find no error in this determination." *Id.*

Additionally, *Miranda* is not violated solely because an officer fails to ask the defendant if he understood his rights. For example, in *United States v. Hayes*, 385 F.2d 375 (4th Cir. 1967), the Fourth Circuit explained, " 'The determination of whether here has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " *Id.* at 377 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938)). "Just as

the mere signing of a boilerplate statement to the effect that a defendant is knowingly waiving his rights will not discharge the government's burden, to the mere absence of such a statement will not preclude as a matter of law the possibility of an effective waiver." *Id.* The Fourth Circuit found:

> Thus, we cannot accept appellant's suggestion that because he did not make a statement— written or oral— that he fully understood and voluntarily waived his rights after admittedly receiving the appropriate warnings, his subsequent answers were automatically rendered inadmissible. Of course, the attendant facts must show . . . that he did relinquish his constitutional rights knowingly, intelligently and voluntarily, but a statement by the defendant to that effect is not an essential link in the chain of proof.

*Id.* at 377–78.

Therefore, in *Hayes*, the appellate court found no error in the district court's conclusion that there was a voluntary and intelligent waiver because there was no "physical or psychological coercion," defendant "appeared physically healthy and alert," he was "fully advised of his constitutional rights," and he had the wherewithal to terminate the encounter. *Hayes*, 385 F.2d at 378. Further, the Fourth Circuit noted:

> Against these telling circumstances, the appellant offered no evidence. He produced no witnesses putting in question his apparent intellectual endowments. Moreover, it is noteworthy that at no stage in the proceedings has the appellant ever denied that he understood the warnings given him, and while a defendant does not have the obligation to testify himself or to offer testimony, a court cannot supply evidence that is lacking. *Cf. Griffin v. State of California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965).

*Id.* Additionally, other evidence demonstrated that he thought clearly. *Id.* In sum: "In light of the strong circumstances appearing here, [the Fourth Circuit] conclude[d] that Hayes did in fact make an intelligent, knowing and voluntary waiver and that the incriminating statements were properly admitted." *Id.*

Similarly, in *United States v. Rubio*, 709 F.2d 146 (2d Cir. 1983), the Second Circuit found that the district court did not commit clear error in finding that certain statements after an arrest

were made knowingly and voluntarily. *Id.* at 152–53. Defendant complained that the agent "failed to remember if [the defendant] stated he understood the *Miranda* warnings," but the Second Circuit rejected this argument:

> While it is true that the government has the burden of demonstrating that a defendant has knowingly waived his Fifth and Sixth Amendment rights, *Miranda*[, *supra*,] both the Supreme Court and this circuit have recognized that an express statement by the defendant is not necessary to establish such a waiver. [*Butler,* 441 U.S. 369, 99 S. Ct. 1755]; *United States v. Boston,* 508 F.2d 1171 (2d Cir.1974), *cert. denied,* 421 U.S. 1001, 95 S. Ct. 2401, 44 L. Ed. 2d 669 (1975). As the Supreme Court stated in *Butler,* "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." 441 U.S. at 373, 99 S. Ct. at 1757.

*Id.* at 152–53. The district court found:

> At the hearing, Rosado impressed me as a man well capable of understanding his rights and asserting them. Far from being the pliant victim which he asserts in his moving papers, it is clear that he understands his rights and was in full command of his faculties when he made the statements which he now seeks to suppress.

*Id.* at 153. There was also no evidence that defendant was subject to "physical or mental abuse" or "protracted interrogation." *Id.* Thus, there was no clear error in the district court's conclusion that the statements should not be suppressed. *Id.*

## C. Analysis

Preliminarily, the Court finds that Callihan complied with *Miranda's* requirements. Again, *Miranda* mandates: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. Callihan fulfilled that, saying (albeit quickly). "Look man. You have a right to remain silent. Anything you say can be used against you in the court of law. Um. You have a right to an attorney. If you can't afford one one will be appointed to you." (Gov't Ex. 2-a, 2:30–2:45; *see also* Tr. 103–104, Doc. 34.) Under Fifth Circuit case law, this satisfies the requirements

of *Miranda*. *See Cardenas*, 410 F.3d at 292. Further, as the above cases demonstrate, Callihan was not legally required to ask Defendant if he understood his rights, *see Hayes*, 385 F.2d at 377–78; *Rubio*, 709 F.2d at 152–53, and Callihan's usual practice of doing so (*see* Tr. 86, 104, Doc. 34) is not controlling. Defendant has pointed to no authority holding that more is required.

Turning to the heart of the matter, the Court finds that Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. As the above authority demonstrates, an individual can implicitly waive his *Miranda* rights by responding to an officer's questions, *see Hearn*, 563 F.3d at 104, and, here Defendant did so. Specifically, Callihan testified that, before Defendant made incriminating statements, Callihan did not threaten him, promise him anything, or physically harm him. (Tr. 75, Doc. 34.) According to Callihan, Defendant never indicated that he did not "understand what was going on," and, in fact, Defendant appeared to understand Callihan, "answer[ed] questions appropriately when asked[,]" and "ask[ed] appropriate questions of [Callihan]." (Tr. 75–76, Doc. 34; *see also* Tr. 62, 77, Doc. 34.) Defendant also did not "appear to be in any physical or mental distress[,]" (Tr. 76, Doc. 34), and he did not "appear to be under the influence of drugs or alcohol" and did not "have slurred speech[] [or] red eyes" (Tr. 62, Doc. 34). Elsewhere, Callihan expressly stated that Defendant appeared to understand his *Miranda* rights and explained: "He was very back and forth in conversation. There was never any time delay, no kind of – I mean, he talked normally. There was no – I mean, he didn't ask me what. He didn't ask me repeat it. I mean, he just – normal conversation." (Tr. 62, Doc. 34.) And Jones's account was like Callihan's with respect to Defendant's ability to understand and the voluntariness of his statements. (*See* Tr. 16, 21–23, 49, Doc. 34.) The Court listed to all of the officers' testimony on these issues and observed their demeanor, and the Court found them highly credible.

The Court has also reviewed the video and finds that it supports the officers' testimony that the Defendant's waiver was legal. Defendant's judgment does not appear impaired in the video, and he responded to questions and offered information freely.

The Court further finds that Defendant's criminal history is a factor on this issue. Callihan thought Defendant had "something juvenile or some little run-ins here and there" in his past as well as an NCIC warrant. (Tr. 77, Doc. 34.) While not an "extensive" criminal history as in *Hearn*, that case still recognizes that a defendant's prior experience with law enforcement and the justice system is a factor to consider in assessing whether a waiver is knowing and voluntary.

The only facts that Defendant highlights are that "Williams does not nod or respond to Callihan in any way" in response to the *Miranda* warning, but he points to no other evidence tending to show that Defendant did not understand the warning or that any waiver was involuntary. (Doc. 36 at 8.) And Defendant also points to no case law to support his argument.

Without more, and balanced against the considerable evidence and legal authority offered against Defendant, the Government has clearly met its burden of showing that he made a knowing, voluntary, and intelligent implicit waiver of his *Miranda* rights. *See Hearn*, 563 F.3d at 104. The waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal citations and quotations omitted). As a result, Defendant's motion to suppress the statements is denied.

**IV.    Conclusion**

Accordingly,

**IT IS ORDERED** that *Defendant's Motion to Suppress* (Doc. 19) filed by Leon Williams

is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>August 27, 2019</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**